## UNITED PARK ASSOCIATION, et al. v. Donna RINGUETTE, Administratrix for the Estate of Gerald M. McGuire

[719 A.2d 884]

No. 97-236

August 31, 1998. Defendant Donna Ringuette, administratrix of the estate of Gerald McGuire, appeals the superior court's order enjoining the closure of McGuire's Mobile Home Park before July 1, 2000. The trial court relied on an option to renew contained in a 1992 lease agreement to determine that plaintiff mobile home tenants had a right to remain in the park until July 2000. We reverse based on our conclusion that later lease agreements superseded the option to renew contained in the 1992 lease agreement.

In the late 1950's, McGuire's sister began operating a five-unit mobile home park. At some point in the late 1970's or early 1980's, McGuire acquired his sister's interest in the park. Until 1992, McGuire and the tenants did not enter into written lease agreements. The monthly lot rent had remained $55 since the 1960's, and thus was far below the average mobile home park lot rent in Chittenden County. On July 1, 1992, at McGuire's request, the tenants — including plaintiff Paul Pepin, plaintiff Katherine Kalanges, George Pepin, and Lucky Kalanges — signed standard lease agreements providing for a month-to-month tenancy. At some point, the following provision was typed between the phrase "WITNESSETH as follows" and the first numbered paragraph of each lease: *"ONE YEAR LEASE with option to renew/extend said one year lease for an additional seven years."* In September 1992, Lucky Kalanges sold his mobile home and assigned his lease to plaintiff Sydney Williams.

Some time in 1993, Ringuette, McGuire's niece, began helping her uncle with the operation of the park. In January 1994, McGuire signed a power of attorney authorizing his niece to manage the park's financial affairs. Although his eyesight and general health were deteriorating at that point, McGuire knew what he was doing when he signed the power of attorney. In March 1994, Ringuette sent each of the tenants a certified letter informing them that she was taking over operation of the park and that they should pay rent to her. They did so thereafter.

Later in the spring of 1994, Ringuette sent each of the tenants a lease increasing the monthly lot rent from $55 to $100. Under the provisions of the month-to-month tenancy created therein, the tenants could terminate the lease by giving at least thirty days' written notice, and could be evicted only for limited reasons corresponding to those specified in the mobile home park statute. See 10 V.S.A. § 6237(a). Paul Pepin signed the new lease in May 1994 and began making the $100 monthly payments without showing Ringuette his 1992 lease. Katherine Kalanges informed Ringuette that she already had a lease with McGuire, but signed the new lease in June 1994 and began making the $100 monthly payments without showing Ringuette the 1992 lease. In September 1994, plaintiff Paul Poquette, who had bought his mobile home from the estate of George Pepin, signed the new lease and began making the $100 monthly payments.

Sydney Williams discussed the new lease with Ringuette for a couple of hours, and then refused to sign it. In-

stead, some time in the summer of 1994, he had the following amendment typed onto the bottom of the first page of his 1992 lease:

> *AMENDMENT TO THIS LEASE* We do hereby consent and authorize the above options to renew and extend this Lease as stated above in original (1+7) year Lease. An increase to $60.00 per month rent shall be effective on *August 1, 1994* for one year — through the end of July 1995. An increase to $66.00 per month rent shall be effective on *August 1, 1995* for one year — through the end of July 1996 and thereafter until further agreement.

The signature of the then eighty-four-year-old McGuire appears below the amendment. Identical amendments were typed onto the bottom of the first page of the 1992 leases possessed by Katherine Kalanges and George Pepin. McGuire's undated signature appears under the amendments affixed to those leases as well.

In October 1994, Williams' attorney wrote Ringuette's attorney a letter contending that his client's 1992 lease and recent amendment to that lease were valid, and that Williams had the right to remain in the park through July 1996. In March 1995, following negotiations between the two attorneys that included discussions concerning the validity of the amendment to the 1992 lease, Williams signed the 1994 lease with some minor revisions and retroactively commenced paying $100 in monthly lot rent from August 1, 1994.

In December 1995, after McGuire's death, Ringuette presented the tenants with a second new lease, to be effective as of March 1, 1996, that increased the lot rent from $100 to $150 per month. Each of the tenants signed the new lease, but Williams and Poquette protested the rent increase and formed a tenants association — plaintiff United Park Association — to negotiate with Ringuette. In April 1996, Williams and Ringuette signed a mediation agreement providing that rent would be increased to $120 per month effective May 1, 1996, with the agreement to remain in effect for one year.

Thus, by early 1996, Pepin, Kalanges, and Williams had each signed at least one new lease from Ringuette *after* signing the 1994 amendment to the 1992 lease with McGuire. Poquette had signed two leases with Ringuette without ever having signed the 1992 lease or the 1994 amendment to that lease. The detailed, nine-page leases the tenants signed with Ringuette between late 1994 and early 1996 each contained the following provision: "This Lease and the Rules and Regulations represent the entire agreement between the parties."

On May 10, 1996, Ringuette notified the tenants and the State Department of Housing and Community Affairs of her intent to close the park on June 1, 1997. See 10 V.S.A. § 6237(a)(5) (requiring mobile home park owner to give leaseholders and commissioner of housing and community affairs at least one-year notice of termination of park). In January 1997, plaintiffs filed suit, seeking preliminary and permanent injunctions prohibiting the closing of the park.

Following a hearing, the superior court denied Ringuette's motion for judgment on the pleadings and granted the plaintiffs' requests for preliminary and permanent injunctions prohibiting closure of the park through June 2000. The court concluded that the option to renew contained in the 1992 lease remained viable, ruling that the minimum one-year notice provision contained in § 6237(a)(5) was intended only to set a statutory minimum notice requirement and did not prevent owners and lessees from negotiating longer leases giving the lessees additional

security. Ringuette appeals, arguing that (1) Poquette has no valid claim to remain in the park because he never signed the 1992 lease containing the option provision; (2) Pepin, Kalanges, and Williams are estopped by their later actions from claiming that they exercised their option to renew the lease until the year 2000; (3) the 1994 amendment to the 1992 lease was void because McGuire was incompetent in the summer of 1994 when the amendment was added to the lease; and (4) Vermont law gave her an absolute right to close the park within twelve months of giving the statutory notice, even if the tenants had valid leases through June 2000.[*]

---

[*] According to plaintiffs, the only argument that Ringuette reserved for consideration on appeal is her contention that § 6237(a)(5) affirmatively authorizes mobile home park owners to shut down mobile home parks upon one year's notice notwithstanding the existence of longer lease agreements. We disagree. While presenting her argument in terms of equitable estoppel, Ringuette contended in her pleadings and presentation at trial that, by signing the later leases, the tenants were precluded from relying on the option-to-renew provision contained in the 1992 lease and allegedly exercised in the 1994 amendment to that lease. Cf. *Cameron v. Double A. Servs., Inc.*, 156 Vt. 577, 581 n.1, 595 A.2d 259, 261 n.1 (1991) (argument that plaintiffs were equitably estopped from asserting right of first refusal was not presented to trial court and thus waived). The superior court ruled directly on the issue of whether the later lease agreements precluded the tenants from relying on the option contained in the 1992 lease, and the court had the opportunity to consider the competency issue. Thus, the arguments Ringuette raises on appeal are properly before this Court. See *Duke v. Duke*, 140 Vt. 543, 545, 442 A.2d 460, 462 (1982) (preservation rule is based on Supreme Court's reluctance to consider issues that trial court had no opportunity to consider).

Although plaintiffs focused on the 1994 amendment as evidence that they had exercised the option to renew contained in the 1992 lease, the trial court relied exclusively on the 1992 lease, and not the 1994 amendment to that lease, in determining that the tenants had retained an option to renew their leases through June 2000. The court did not explain why it chose not to rely on the 1994 amendment, but the facts speak for themselves. Approximately six months before the tenants approached McGuire to sign the 1994 amendment, Ringuette informed them that her eighty-four-year-old uncle had signed a power of attorney authorizing her to manage the park's financial affairs. During that six-month period, the tenants paid their rent to Ringuette. Yet, without informing Ringuette, the tenants went back to McGuire to seek a better agreement than that offered by Ringuette. Ringuette's undisputed testimony, cited in the court's findings, was that (1) by April 1994 McGuire's health had deteriorated to the point where the family had hired care providers to look after him; and (2) after the spring of 1994, McGuire forgot to eat at times, neglected his personal hygiene, and failed to recognize certain family members that should have been familiar to him. Considering these facts, the enforceability of the 1994 amendment to the 1992 leases was in serious doubt. See *In re McGuire Estate*, No. 97-087 (Vt. Feb. 6, 1998) (unpub. mem.) (Lucky Kalanges collaterally estopped from relitigating contractual claim, given stipulation in earlier lawsuit between him and Gerald McGuire that lease signed by parties in August 1994 was void because of McGuire's questionable mental competency).

Rather than rely on the 1994 amendment, the court determined that the tenants' continued payment of rent under the terms of the 1992 lease agreement after it had expired in 1993 kept the option to renew alive even though the

tenants had not expressly extended or renewed the option within the one-year period of the lease. Courts from other jurisdictions have arrived at different conclusions, depending on the circumstances, as to whether mere continued payment of rent is sufficient to extend or renew the terms of a lease. See Annotation, *Waiver or Estoppel as to Notice Requirement for Exercising Option to Renew or Extend Lease*, 32 A.L.R.4th 452 § 3, at 460-64 (1984); cf. *Toys, Inc. v. F.M. Burlington Co.*, 155 Vt. 44, 50, 582 A.2d 123, 126 (1990) (essence of option must be accepted according to its terms in order to generate binding contract; terms of option must be strictly complied with by optionee). We need not concern ourselves with that question here, however, because we conclude that subsequent leases the tenants signed with Ringuette superseded the 1992 lease.

The trial court believed that the option-to-renew provision from the 1992 lease remained viable, notwithstanding the later leases signed by Ringuette and the tenants, because the only provision in the later leases that was inconsistent with the option-to-renew provision — the month-to-month tenancy — violated statutory law restricting the reasons for evicting mobile home tenants and thus was unenforceable. We disagree. The later leases contained provisions explicitly tracking the statutory provisions limiting the grounds for evicting tenants. The leases also contained provisions creating a month-to-month tenancy and allowing the tenants to terminate their tenancy following thirty days' notice. Even assuming that the month-to-month-tenancy provision contained in the later leases was inconsistent with statutory law and thus unenforceable, it evinced the parties' understanding that the leases were not intended to provide any security beyond that guaranteed by the statute.

We recognize that under general contract law independent contracts related to the same subject matter can coexist to the extent that they are not clearly inconsistent. See 6 A. Corbin, Corbin on Contracts § 1296, at 212-13 (1962); *Chappell v. Northern Realty, Inc.*, 128 Vt. 476, 479, 266 A.2d 453, 456 (1970) (two contracts in connection with particular transaction may coexist as long as contracts are not inconsistent with each other). But this is not the situation here. The 1992 lease was a one-year lease that commenced on July 1, 1992. It contained a provision allowing the parties to renew *that* lease on a yearly basis for up to seven years; however, from at least the time the parties signed new leases containing new terms, there was no 1992 lease left to renew. Each of the tenants, at least one of them following consultation with and negotiation by counsel, signed new leases with Ringuette. There is no evidence that the detailed leases the tenants signed with Ringuette between late 1994 and early 1996 were not intended to cover the parties' full and complete understanding concerning the lease of the mobile home park lots. No provision in those leases gives the tenants an option to renew or suggests that the parties intended to incorporate therein the option-to-renew provision contained in the 1992 lease.

In short, the undisputed material facts do not support the court's conclusion that the option contained in the 1992 lease survived the later leases signed by the parties. See *Thomas v. Johnson*, 108 Vt. 363, 367-68, 187 A. 375, 377 (1936) (general rule is that when new contract is in regard to same subject matter and has same scope as earlier contract, and terms are inconsistent either in whole or in substantial part so that they cannot subsist together, new contract abrogates earlier one in toto and takes its place, even though there is no express agreement that new contract shall have that effect); see also *Puretest Ice Cream, Inc. v. Kraft, Inc.*, 806 F.2d 323, 325 (1st Cir. 1986) (where subject matter of one contract is

subsequently entirely subsumed in another, later contract becomes exclusive medium of ascertaining parties' understanding, and earlier contract disappears); *Barnum v. Millbrook Care Ltd. Partnership*, 850 F. Supp. 1227, 1236 (S.D.N.Y.) (it is well established that subsequent contract regarding same subject matter will supersede prior contract), *aff'd*, 43 F.3d 1458 (2d Cir. 1994) (table). Because we conclude that the later leases signed by the tenants superseded the 1992 lease, including the option-to-renew provision contained therein, we do not address the issue of whether § 6237(a)(5) gives mobile home park owners an absolute right to close mobile home parks upon one year's notice notwithstanding the existence of longer leases.

*Reversed.*