**C. K., Petitioner**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 3, 2005.

Decided March 1, 2005.

---

John E. Perrott, Uniontown, for petitioner.

Anthony S. Dedola, Jr., Uniontown, for respondent.

BEFORE: PELLEGRINI, Judge, COHN JUBELIRER, Judge, and JIULIANTE, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

C.K. appeals from an order of the Department of Public Welfare, Bureau of Hearings and Appeals (DPW), adopting the recommendation of the Administrative Law Judge (ALJ) that her appeal requesting to have her name expunged from the ChildLine Registry as an indicated perpetrator of sexual abuse be denied.[1] C.K. asserts on appeal that the ALJ erred in finding that she placed her three children in "imminent risk of sexual abuse" by living with two individuals, S.S. and F.K. (the couple), who are "indicated perpetrators of sexual abuse" under the Child Protective Services Law (Law).[2]

On appeal, C.K. argues that the ALJ erred by: (1) not properly considering, applying and giving persuasive effect to DPW's stated policy defining what must be established to prove "imminent risk"; (2) concluding that imminent risk of sexual abuse existed where the children had contact with the couple; and (3) engaging in fact-finding that was unsupported by substantial evidence, as well as engaging in speculation and conjecture to reach the conclusion that C.K.'s children were placed in imminent risk of abuse. The main issue presented is whether evidence that a parent, after being told not to do so, repeatedly lives with her very young children in a home with "indicated perpetrators of sexual abuse," is sufficient to demonstrate an "imminent risk of sexual abuse" under the Law.

On November 26, 2002, Fayette County Children and Youth Services (FCCYS) received a report of suspected child abuse involving C.K.'s three children: D.M., born December 12, 1995; D.K., born November 9, 2000; and L.B., born January 22, 2002. The concern was that C.K. was permitting contact between her children and the couple, who were known to both FCCYS as well as C.K. as indicated sexual perpetrators. The report was called into ChildLine and ChildLine called the FCCYS. Caseworker Patrick Hudock was assigned to investigate. After Hudock conducted interviews with C.K., he filed three CY–48's.[3] Thereafter, C.K. requested that the indicated cases against her be expunged. The ChildLine and Abuse Registry denied her request to expunge the record, and she then filed an appeal to DPW.

A hearing was conducted on August 5, 2003, at which Hudock and Darek Eberhart (Eberhart), both caseworkers, testified. C.K. did not testify, and the ALJ found both caseworkers credible.[4] Eberhart became involved with C.K.'s family in early 2002 because there were concerns about the youngest child. In February, 2002, Eberhart received a report that C.K. and her children were living with the couple, who were listed on the ChildLine Registry as indicated perpetrators of sexual abuse. (N.T. at 9.) On February 28, 2002, Eberhart went to the couple's residence,

---

1. ChildLine is a unit of the DPW that operates a statewide toll-free system for receiving reports of suspected child abuse, makes referrals for investigation and maintains the reports in the appropriate files. 55 Pa.Code § 3490.4; 23 Pa.C.S. § 6332.

2. 23 Pa.C.S. §§ 6301–6385.

3. The CY–48's are marked as exhibits C–1, C–2, and C–3. The CY–48's are entitled "Child Protective Service Investigation Report."

4. Because the facts as found by the ALJ are not in chronological order, and because some of his findings include the wrong dates (apparently typographical errors), some of the facts discussed in this opinion are elicited from the credited testimony given at the hearing.

found C.K. and her children there, and informed C.K. that her children could not have contact with the couple. He asked C.K. to return to live with her mother. Eberhart testified that after this **first warning,** C.K. and her children did return to her mother's residence. (N.T. at 10.)

On March 6, 2002, Eberhart received a second report that C.K. and her children were again residing at the couple's residence. (N.T. at 10.) Eberhart, again, went to the couple's residence, where he found C.K. and her children. This time, Eberhart took with him a family service worker and a Pennsylvania State Police officer. At this time, C.K. admitted to Eberhart that she and the children had been living with the couple since at least February 28, 2002. Eberhart gave C.K. a **second warning** that she and her children were to have no contact with the couple due to reports that they were indicated sexual abusers. (N.T. at 13–14.) Eberhart, the family service worker and the officer physically helped to move C.K. and her children out of the couple's residence and back to her mother's home. (N.T. at 10.)

On November 22, 2002, Hudock became involved with C.K. and her children because FCCYS received a third report that C.K. and her children were again living with the couple. (N.T. at 25.) Apparently, C.K. and her children had moved to a different county after the second warning and, around November, 2002, they moved back to Fayette County. Because of this new report, Hudock contacted another caseworker, Matt Marsiglia, and a state police officer to go with him to the couple's residence. (N.T. at 25.) The meeting place was at a Sheetz service station in Connellsville. Before the state police officer arrived, the caseworkers noticed C.K. and her children in a vehicle with S.S. The caseworkers approached the vehicle, iden-

tified themselves, told them why they were there, and asked C.K. if she was living with the couple. She initially indicated to them that she was not living with the couple but, rather, had a trailer of her own. She refused to take the caseworkers to her trailer and told them that the children's belongings were at several different locations. (N.T. at 26–27.) At this point, the caseworkers made arrangements to take C.K. and her children back to C.K.'s mother's home, which they did. While at her mother's home, C.K. admitted to Hudock and Marsiglia that she and her children were living with the couple because "she was in the process of moving back from Clearfield County." (N.T. at 28.) The caseworkers issued her a **third warning** and completed a safety plan with C.K., which she signed. (N.T. at 29.) This plan asked her not to allow her children to have any contact with the couple. Upon arriving back at the FCCYS office, Hudock completed the paperwork to accept the case for services, where FCCYS would help secure appropriate housing for the children. The case was then transferred back to Eberhart, who filed a petition for custody of the children.

As a result of Hudock's investigation on December 4, 2002, he filed one CY–48 for each of the children. Hudock testified that the filing of the indicated reports was based upon the fact that C.K. admitted to him that she and the children were living with the couple. In Hudock's opinion, this "contact" was putting the children in "imminent risk" of sexual assault after several warnings were given to C.K. (N.T. at 29–30.)

On April 13, 2004, the ALJ issued findings of fact and an opinion in which he recommended that C.K.'s appeal be denied. Specifically, the ALJ found that the children had contact with the couple, as evidenced by C.K.'s admission that she

was living with them from February 28, 2002 until March 6, 2002.[5] "She [C.K.] could not watch these three (3) children every minute of the day. So the proximity to the children and the exposure gave the indicated abusers the opportunity to abuse these children once again." (ALJ Op. at 6.) The ALJ went on to state that "[t]he Department does not have to show the time, content and circumstances of the abuse, nor, in fact, that there was any abuse at all. The Department need only show that [C.K.] exposed her children to imminent risk of abuse. And that she did, and the facts support this finding." *Id.*

▬▬▬ The ALJ also distinguished two recent Commonwealth Court decisions, *C.F. v. Pennsylvania Dep't. of Pub. Welfare*, 804 A.2d 755 (Pa.Cmwlth.2002), and *E.D. v. Dep't. of Pub. Welfare*, 719 A.2d 384 (Pa.Cmwlth.1998), both of which involve physical abuse, from the case at bar, which involves sexual abuse. Further, the ALJ noted that the other cases concern one isolated incident of brief duration while, in this case, C.K. exposed her children to the indicated perpetrators on *repeated* occasions and for long periods of

time after she was warned several times not to do so. In conclusion, the ALJ stated:

> Had there been no intervention, this exposure would undoubtedly have continued. Quite obviously, of course, that fact is conjecture on the part of the Court. But conjecture, in the final analysis, is what the imminent risk statutes ask the Courts to do. No one can know with certainty if the subject children herein would have been molested by S.S. and F.K. It is simply a mat[t]er of probabilities. If the intent of the Child Welfare laws in the Commonwealth of Pennsylvania are to protect children to the very best of our abilities, then those probabilities must always be considered and weighed.

(ALJ Op. at 9.) On April 14, 2004, the Regional Manager of the DPW adopted the ALJ's recommendation in its entirety. This appeal ensued.[6]

Section 6341(a)(2) of the Law, 23 Pa. C.S. § 6341(a)(2), states in pertinent part:

> Any person named as a perpetrator ... in an indicated report[7] of child abuse

---

5. In finding of fact # 21, the ALJ incorrectly referred to the dates at issue as being in the year 2003 instead of 2002. That finding should state, "C.K. admitted to Mr. Eberhart on March 6, 2002, that she had been living with S.S. and F.K. since February 28, 2002." The ALJ made the same mistake on page 6 of his Opinion, where he should have indicated that C.K. and her children were living with the couple from February—March 2002, not 2003.

6. Our review in expunction proceedings is limited to a determination of whether constitutional rights were violated, whether errors of law were committed, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *E.D.*, 719 A.2d at 387. Substantial evidence, for purposes of child abuse expunction proceedings, is defined as "evidence which so preponderates in

favor of a conclusion that it outweighs, in the mind of the factfinder, any inconsistent evidence and reasonable inferences drawn therefrom." *Id.* (internal citations and quotations omitted).

7. The Law defines an "indicated report" as follows:

> A child abuse report made pursuant to this chapter if an investigation by the county agency or the Department of Public Welfare determines that substantial evidence of the alleged abuse exists based on any of the following:
> (1) Available medical evidence.
> (2) The child protective service investigation.
> (3) An admission of the acts of abuse by the perpetrator.

23 Pa C.S. § 6303. The county agency bears the burden of proving in an expungement case that the actions of the perpetrator

may, within 45 days of being notified of the status of the report, request the secretary to amend or expunge an indicated report on the grounds that it is inaccurate or it is being maintained in a manner inconsistent with this chapter.

(Footnote added.)

Section 6303(b)(1) of the Law, 23 Pa. C.S. § 6303(b)(1), defines child abuse as follows:

(1) The term "child abuse" shall mean any of the following:

. . . .

(iii) Any recent act, failure to act or series of such acts or failures to act by a perpetrator which creates an *imminent risk* of serious physical injury to or sexual abuse or sexual exploitation of a child under 18 years of age.

(Emphasis added.)

The term "imminent risk" has not been defined by statute or by the appellate courts. The DPW published *proposed regulations* in its OCYF (Office of Children, Youth and Families) Bulletin which provide guidelines for its interpretation of "imminent risk." This Court discussed the proposed regulations in *E.D.*, 719 A.2d at 387–389, and stated:

A *proposed* regulation does not have the force of law, as does one duly promulgated. As such, it remains a statement of policy of the agency that has persuasive, but not binding, power if it tracks the meaning of the related statute. We believe the proposed regulations quoted in this opinion do sufficiently track the meaning of the related amendments to the Child Protective Services Law and are persuasive in our interpretation of "imminent risk." The OCYF Bulletin publishing the proposed regulations indi-

cates that they are to be treated as guidelines until publication as final rulemaking in the *Pennsylvania Bulletin.* OCYF Bulletin, 3490–95–02, p. 1.

(Some citations omitted.)

*E.D.*, 719 A.2d at 389 n. 3 (emphasis in original). The proposed regulations provide in part:

(II.) To substantiate imminent risk of serious physical injury or sexual abuse/exploitation:

(A) a specific act or failure to act must be documented;

(B) the act or failure to act must result in risk of abuse; i.e., be supported by substantial evidence that serious physical injury or sexual abuse/exploitation would have occurred;

(C) the risk of abuse must have been imminent;

(1) For risk of serious physical injury, "imminent" means during and/or immediately following the act or failure to act.

(2) For risk of sexual abuse/exploitation, "imminent" means the specific time frame during which the child was exposed to risk of such abuse.

(D) [f]or an alleged act of imminent risk of serious physical injury:

(1) there must be substantial evidence that, but for happenstance, the intervention of a third party or actions by the alleged victim, serious injury would have occurred; and

(2) the injury would have been serious; i.e., would have:

(i) caused the child severe pain; or

(ii) significantly impaired the child's physical functioning.

constitute child abuse within the meaning of the statute. *B.J.K. v. Dep't. of Pub. Welfare,* 773 A.2d 1271, 1275 (Pa.Cmwlth.2001). The

county's evidence must outweigh any contrary evidence. *Id.*

. . . .

**(F) [f]or alleged imminent risk of sexual abuse or sexual exploitation: (1) there must be substantial evidence that an action on the part of the alleged perpetrator placed the child at imminent risk of sexual abuse/exploitation; or**

**(2) there must be substantial evidence that the alleged perpetrator had known or should have known of the risk of sexual abuse and failed to exercise reasonable judgement in preventing such risk.**

(OCYF Bulletin, 3490–95–02, pp. 3–4, 2(b)(II))(emphasis added).

C.K. argues that the ALJ erred because he failed to properly consider and apply DPW's stated policy defining "imminent risk" and failed to give that policy persuasive effect. Specifically, C.K. argues that the ALJ erred by failing to determine whether "imminent risk" in this case is based on a specific act or failure to act, by failing to state whether "imminent risk" was based on a single act or a series of acts, and by failing to set out whether "imminent risk" had been substantiated. Further, C.K. argues that it was an error for the ALJ to distinguish *E.D.* and *C.F.* on the basis that those cases involved physical abuse.

FCCYS counters by arguing that: (1) the documented specific action is the fact that C.K. and her children lived with indicated perpetrators of sexual abuse despite the fact that C.K. had been specifically warned numerous times not to; (2) that act resulted in subjecting her children to the risk of sexual abuse; (3) by living with indicated perpetrators of sexual abuse, the risk of abuse is "imminent" in that given the access and availability of the known indicated perpetrators to these children by living with them, the abuse could occur at virtually any time; and (4) C.K.'s actions

placed the children in imminent risk because the testimony showed that she was warned on several occasions regarding the risks of living with known indicated perpetrators, but continued to do so. Therefore, the multiple warnings given to C.K. are substantial evidence to prove that she had knowledge or should have known of the risk of sexual abuse in her young children living with indicated perpetrators of sexual abuse and failed to exercise reasonable judgment in preventing the risk of sexual abuse. *See* OCYF Bulletin, 3490–95–02, pp. 3–4, 2(b)(II)(F).

■ We agree with the FCCYS that a careful reading of the ALJ's opinion demonstrates that he understood the proposed regulations and correctly applied them in the instant case. The ALJ recited the testimony of the caseworkers and then concluded:

In the instant matter, [C.K.'s] bad judgment was clearly shown. She exposed the children to persons with a record of indicated sexual abuse, on repeated occasions. She was warned not to do so, but continued.

(ALJ Op. at 12.) The ALJ also distinguished the facts and circumstances in this case from those in *C.F.* and *E.D.*

In *C.F.*, the mother had a ten-month-old child whom she left unattended in a bunk bed for fifteen minutes while she went downstairs to prepare the child's bottle. Upon returning to the bedroom, the child was stuck with his head between the edge of the mattress and the bed frame of a bunk bed, and was later pronounced dead. Subsequently, an indicated report of child abuse was filed against the mother. After the mother's indicated report was expunged, the Secretary of the DPW set aside the expungement. On appeal, we directed our attention to the criminal negligence standard in determining if this ac-

cident was non-accidental. We held that the mother's action did not meet the definition of child abuse because that definition only targets non-accidental events. Here, the mother could not predict that her child would die when she left him for a short period of time to prepare his bottle. Furthermore, the medical examiner found no evidence of trauma prior to the child's death. We also held that leaving this child alone for fifteen minutes did not constitute serious physical neglect under the DPW's regulations because the mother did not *repeatedly* leave her child alone. After considering the *totality of the circumstances*, which included a clean home, the child being left alone only so the mother could tend to his "essentials of life," a supportive family, and a single incident, we found that, although the mother's action was not wise, it was not criminal negligence, which was a required element, and, therefore, was not child abuse. *C.F.*, 804 A.2d at 760–61.

Similarly, in *E.D.*, the indicated report was based on a single act. An observer saw a five-year-old boy being pursued by his father. The child was wearing a protective helmet fastened to his head by a chinstrap. The child dropped to his knees and the father grabbed him by the helmet, his fingers inside the air holes, and then lifted the child, suspending him. The child's face was red, the observer heard gurgling noises and, subsequently, yelled out to the father. The father dropped the child and the incident was over in approximately three seconds. Thereafter, an indicated report of child abuse was filed. The father sought review of the DPW's order denying his appeal from the filing of the indicated report. On appeal, the issue presented to us was whether the father placed the child at *imminent risk of serious physical abuse.* Because "imminent risk" was not defined by the Law, we utilized the DPW's proposed regulations in

interpreting that term. We held that the father did not place his child in imminent risk of physical abuse because the report was based on this *one act* alone; there was no evidence that this one act would have caused severe pain to the child had the observer not cried out, nor was there evidence to suggest that the father would have suspended the child long enough to cause him physical injury. Further, there was no evidence to suggest that the father's *past behavior or circumstances* would have supported a finding that he would have caused the child severe injury. *E.D.*, 719 A.2d at 389.

In the case *sub judice*, the ALJ found that C.K.'s "bad judgment" in residing with her children in the home of indicated sexual perpetrators on repeated occasions was the "act" and/or "repeated acts." The ALJ also concluded that her repeated failure to heed several warnings not to place her children in a home with indicated sexual perpetrators was enough to substantiate the fact that C.K. placed her children in imminent risk of sexual abuse. Further, we observe that not only did the caseworkers warn the mother not to live with the couple but, on two occasions, they physically removed her and her children from the couple's residence into a safer home. We, thus, conclude that C.K.'s repetitive conduct of living with the couple put her children in a situation where they were exposed to indicated sexual perpetrators for an extended and consecutive amount of time.

Next, C.K. asserts that FCCYS's and the ALJ's position that "contact" between children and indicated perpetrators of sexual abuse is, in effect, equivalent to "imminent risk" of sexual abuse, is legally incorrect. She argues that the ALJ adopted his own standard by equating "contact" with "imminent risk." C.K. further argues that there is no evidence of any specific

circumstances or events that placed her children in imminent risk of sexual abuse by the couple and contends that it is inadequate for FCCYS to allege simply that she and her children resided with the couple for an unspecified period of time and, therefore, the children must have been in imminent risk of sexual abuse.[8]

FCCYS counters that C.K. would have this Court believe that the only way that "imminent risk" may be found is if the perpetrator is virtually in the act of abusing a child before someone or something intervenes. This, it claims, is illogical and flies in the face of the public policy, given that the intent of child welfare laws is to protect children.

Taking DPW's proposed regulations into consideration when defining "imminent risk," subsection F(2) clearly states that "there must be substantial evidence that the alleged perpetrator had known or should have known of the risk of sexual abuse and failed to exercise reasonable judgement in preventing such risk." (OCYF Bulletin, 3490–95–02, pp. 3–4, 2(b)(II)F(2).)

■ Looking at the totality of the circumstances, it is clear that C.K placed her children in "imminent risk" of sexual abuse by refusing to comply with **several warnings** from FCCYS caseworkers and re-

peatedly taking her young children to live with indicated perpetrators of sexual abuse for consecutive days in February–March and then, again, in November of 2002. C.K.'s actions were repetitive and lasted for an extended period of time. Further, there were two indicated perpetrators of sexual abuse with records of which C.K. was aware, and three very young children who arguably could not protect themselves. Because of the warnings, and the physical removal of herself and her children from the home, C.K. had knowledge or should have known of the risk of sexual abuse, and her actions of continuing to return with her children to the home is a failure to exercise reasonable judgment in preventing that risk. C.K.'s actions provided the indicated perpetrators of sexual abuse an ongoing opportunity to abuse her children, which placed the children in "imminent risk."

■ Finally, C.K. argues that the ALJ engaged in fact-finding, which was unsupported by substantial evidence, as well as speculation and conjecture to reach his conclusion that C.K.'s children were placed in imminent risk of sexual abuse. C.K. contends that, because the ALJ incorrectly wrote the year as 2003 instead 2002 in some of his findings of fact, *see* n. 5, the findings were unsupported by the evi-

---

8. C.K. also improperly cites to an unreported case of this Court to support her argument that "contact" with a child and a "perpetrator" does not constitute "imminent risk." First, under § 414 of our Internal Operating Procedures, 210 Pa.Code § 67.55, the unreported case has no precedential value and may not be cited in another opinion. Furthermore, the facts in that case were very different from the circumstances here. In that case, the contact occurred when the child's stepfather, who was *not* listed on the ChildLine Registry as an indicated perpetrator of child abuse, drove the child home from school at the mother's request because the child was sick and she was unable to pick her

up. The mother brought the appeal, requesting to have her name expunged from ChildLine as an indicated perpetrator; she had been listed because she had violated an adjudication of dependency ordering her not to leave the child alone with the stepfather because the stepfather had admitted to having fantasies about the child, although he had never acted on them. We concluded in that case that the risk to the child was not "imminent." Here, however, there was repeated and lengthy contact between the children and the couple, who were listed on the ChildLine Registry as indicated perpetrators of sexual abuse, after C.K. had been repeatedly directed not to do so.

dence. Further, C.K. points to the ALJ's opinion where he states that "the proximity to the children and the exposure gave the indicated abusers the opportunity to abuse these children *once again.*" (ALJ Op. at 6.)(Emphasis added.) C.K. argues that there was no evidence that the couple *ever* abused her children at all. C.K. also argues that the ALJ engaged in unjustified speculation in denying C.K.'s appeal by making assumptions unsupported by the record. For example, the ALJ stated in his opinion that the children were exposed to the couple over a period of weeks and months, and C.K. argues that this finding was not sufficiently proved.

■ The ALJ found the caseworkers credible.[9] By focusing on their testimony we can easily discern the chronological order of the facts. Furthermore, it is also clear that the ALJ considered the totality of the circumstances in concluding that

C.K. placed her children in imminent risk of sexual abuse and did not rely solely on any finding that contained an incorrect year due to a typographical error. Thus, we conclude that any error involving the incorrect year is, at most, harmless.[10]

Based on the foregoing opinion, the DPWs order denying C.K.s appeal is hereby affirmed.

### ORDER

**NOW**, March 1, 2005, the order of the Department of Public Welfare in the above-captioned matter is hereby affirmed.

■

9. The Secretary of DPW or her designee is the ultimate fact finder in expungement proceedings, with the authority to make credibility determinations. *R. v. Dep't. of Pub. Welfare,* 535 Pa. 440, 446, 636 A.2d 142, 154 (1994).

10. We determine that the phrase "once again" on page 6 of the adjudication refers to "exposure" as the children were "once again" exposed to the couple, thus, providing the opportunity for abuse, not that they were once again *abused* by the couple. Moreover, the ALJ's statement that the children were exposed to the couple over a period of weeks and months is accurate in that the evidence shows repeated contact spanning from February 2002 through November 2002.