J-S28002-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: A.D.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.D.M. | |
| Appellant | No. 94 MDA 2015 |

Appeal from the Order Entered November 25, 2014
In the Court of Common Pleas of Franklin County
Orphans' Court at No(s): 41-Adopt-2014

| | |
|---|---|
| IN RE: ADOPTION OF: L.B.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.D.M. | |
| | No. 95 MDA 2015 |

Appeal from the Order Entered November 25, 2014
In the Court of Common Pleas of Franklin County
Orphans' Court at No(s): 42-Adopt-2014

| | |
|---|---|
| IN THE INTEREST OF: L.B.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.D.M. | |
| Appellant | No. 96 MDA 2015 |

Appeal from the Order Entered November 25, 2014
In the Court of Common Pleas of Franklin County
Juvenile Division at No(s): CP-28-DP-0000050-2013

| | |
|---|---|
| IN THE INTEREST OF: A.D.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.D.M. | |
| Appellant | No. 97 MDA 2015 |

J-S28002-15

Appeal from the Order Entered November 25, 2014
In the Court of Common Pleas of Franklin County
Juvenile Division at No(s): CP-28-DP-0000051-2013

BEFORE:  BOWES, ALLEN, and LAZARUS, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED JUNE 15, 2015**

J.D.M. ("Father") appeals from the orders entered on November 25, 2014, wherein the trial court terminated his parental rights to his minor children, A.D.M. and L.B.M., and changed the children's permanency goals from reunification to adoption.  We affirm.[1]

Franklin County Children and Youth Service[2] ("CYS") became involved with this family on July 3, 2013, in response to a referral alleging that then-six-year-old A.D.M. and L.B.M., his two-year-old brother, were without parental care and control.  J.P. ("Mother") had issues with substance abuse, lacked housing, and did not have the resources to care for her sons.  As Father was incarcerated at SCI Camp Hill for a variety of offenses including theft, criminal trespass, and DUI 4th or subsequent offense, he was unable to

---

[1] The trial court declined to terminate the parental rights of the children's mother, J.P., and the boys' permanency goals remain reunification as it relates to that parent.

[2] We note with disapproval that Franklin County Children and Youth Service failed to file a brief in this matter.

- 2 -

provide parental care. The children were placed in temporary shelter care, and on July 11, 2013, they were adjudicated dependent. The children currently reside together in a pre-adoptive foster home. Father remained incarcerated at either SCI Camp Hill or SCI Rockview throughout the children's placement and was released immediately before the second day of the two-day termination proceedings.

The initial permanency goal for both children was reunification with birth parents. The juvenile court directed Father to participate in psychological evaluations, follow treatment recommendations, achieve financial stability, obtain adequate housing, maintain consistent supervised visitation with the children, and comply with the terms of his criminal sentences and probation. Father's compliance with these expectations was minimal.

While the reality of incarceration made it difficult to achieve some of the FSP goals, Father claimed to have enrolled in substance abuse, violence prevention, money management, and parenting programs at SCI Rockview. However, Father failed to document any of the foregoing achievements. Likewise, he refused to submit a release so that CYS could verify his participation in any of the programs or obtain the results of a purported psychological assessment.

On May 17, 2014, Father participated in one visitation with the children at SCI Rockview, but in doing so, he violated the terms of the interaction by permitting a person without ChildLine clearance to change L.B.M.'s diaper without supervision.[3] Father's only other contact with his sons was two or three letters that misled the children to believe reunification was imminent.[4] Beyond that correspondence, Father failed to send the children birthday cards or presents while he was incarcerated. Indeed, Father declined to participate during the first day of the evidentiary hearing by video conference, and even though he had been released prior to the second day of testimony, he also declined to participate in that day of the hearing.

On August 6, 2014, CYS filed petitions to terminate Mother and Father's parental rights pursuant to § 2511(a) and (b) of the Adoption Act.

_____

[3] ChildLine is a statewide system administered by the Department of Public Welfare that maintains records regarding reports of suspected child abuse. *See C.K. v. Department of Public Welfare*, 869 A.2d 48, 50 n.1 (Pa. Cmwlth. 2005) (citing 55 Pa.Code § 3490.4; 23 Pa.C.S. § 6332).

[4] During August and September 2013, Father mailed then-six-year-old A.D.M. two letters that misinformed the child that Father would be discharged within one or two months and indicated that, after his discharge from prison, A.D.M. and B.L.M. would be released to his care. *See* N.T., 10/3/14, at 60. When Father mailed the letters, he had more than one year remaining to serve on his minimum sentence of imprisonment and no plan to care for the children following his discharge.

Following two days of evidence, the trial court terminated Father's parental rights, and by separate orders entered the same day under the Juvenile Act, it changed the relevant aspects of the children's permanency goals relating to Father from reunification to adoption. As noted in footnote one, the court denied CYS's petitions as they relate to Mother. These timely appeals followed.[5]

Father filed a Rule 1925(b) statement asserting three issues that he reiterates on appeal as follows:

I. The trial court erred in determining that Franklin County Children and Youth Services (FCCYS) met its burden of proving by clear and convincing evidence that J.D.M. . . . cannot or will not remedy the conditions that caused the child to be without parental care in that the evidence showed that Father was only recently released from incarceration and therefore not given the opportunity to demonstrate his ability to care for the child.

II. The trial court erred in determining that FCCYS met its burden of proving by clear and convincing evidence that Father will not be able to remedy the condition which led to the removal of the child within a reasonable time. . . .

III. The trial court erred in terminating Father's rights when Mother's rights were not terminated.

Father's brief at 4.

_____

[5] Although Father appealed the trial court's separate goal change orders, he does not level any legal challenge to either of those orders in his brief. Accordingly, we affirm the orders without discussion.

We apply the following standard of review of an order terminating parental rights:

> In cases concerning the involuntary termination of parental rights, our review is limited to a determination of whether the decree of the termination court is supported by competent evidence. ***Adoption of B.D.S.,*** 494 Pa. 171, 431 A.2d 203, 207 (1981). The party petitioning for termination "must prove the statutory criteria for that termination by at least clear and convincing evidence." ***In re T.R.,*** 502 Pa. 165, 465 A.2d 642, 644 (1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." ***Matter of Sylvester***, 521 Pa. 300, 555 A.2d 1202, 1203–04 (1989).

***In re Adoption of L.J.B.***, 18 A.3d 1098, 1107 (Pa. 2011). As the ultimate trier of fact, the trial court is empowered to make all determinations of credibility, resolve conflicts in the evidence, and believe all, part, or none of the evidence presented. ***In re A.S.***, 11 A.3d 473, 477 (Pa.Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***Id***.

Requests to involuntarily terminate a biological parent's parental rights are governed by 23 Pa.C.S. § 2511, which provides in pertinent part as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>     . . . .

- 6 -

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions

described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

The test for terminating parental rights consists of two parts.  In *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007), we explained:

> Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.  One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

We need only agree with the trial court's analysis as to one subsection of 23 Pa.C.S. § 2511(a) and subsection (b) in order to affirm the termination of parental rights.  *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).  Herein, the certified record supports the trial court's determination that CYS established the statutory grounds to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8) and (b).  Hence, we do not address the remaining statutory grounds.

We have explained our review of the evidence pursuant to § 2511(a)(8), as follows:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A.

§ 2511(a)(8), the following factors must be demonstrated: (1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In Re Adoption of M.E.P.*, 825 A.2d 1266, 1275-1276 (Pa.Super. 2003).

Thus, in order to satisfy the requirements of § 2511(a)(8) in the case at bar, CYS was required to produce clear and convincing evidence that: (1) A.D.M. and L.B.M. have been removed from Father for at least twelve months; (2) the conditions which led to the children's removal continue to exist; and (3) involuntary termination of parental rights would best serve the children's needs and welfare. *See In re Adoption of R.J.S.*, 901 A.2d 502 (Pa.Super. 2006). "Notably, termination under Section 2511(a)(8) does **not** require an evaluation of [a parent's] willingness or ability to remedy the conditions that led to placement of [the] children." *Id*. at 511 (emphasis in original).

First, we observe that A.D.M. and L.B.M. have been in CYS's care since July 3, 2013, due to the complete lack of parenting by either parent. As CYS did not file its petition to terminate Father's parental rights until August 6, 2014, approximately thirteen months later, CYS satisfied the threshold requirement of § 2511(a)(8) requiring that the children be removed from Father for at least twelve months. Next, the certified record reveals that the condition that led to A.D.M. and L.B.M.'s placement in July 2013, Mother and

Father's inability to perform their parental duties, continued to exist and that terminating Father's parental rights would best serve A.D.M. and L.B.M.'s needs and welfare.

The crux of Father's argument is that he could not achieve any of the enumerated FSP goals while he was incarcerated. He continues that, since he was not released from imprisonment until after CYS filed its petitions to terminate his parental rights, the trial court erred in terminating his parental rights without affording him additional time to comply with the FSP. For the following reasons, we disagree.

In *In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super. 2003), we explained, "A parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all available resources to preserve the parental relationship and must exercise 'reasonable firmness' in resisting obstacles placed in the path of maintaining the parent-child relationship." As it relates to incarcerated parents, our Supreme Court reiterated in *In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012), that the primary focus of the § 2511(a)(1) analysis is whether an incarcerated parent exercised reasonable firmness in declining to yield to obstacles created by imprisonment and employed available resources to maintain a relationship with his or her child. The High Court explained, "pursuant to an abandonment analysis [an incarcerated parent has] a duty to utilize

available resources to continue a relationship with his or her child." ***Id***.

While the trial court did not invoke § 2511(a)(1) as a basis to terminate Father's parental rights in this case, the court's rationale relating to § 2511(a)(5) and (8) was founded squarely upon Father's continued unavailability to perform parental duties as evidence that Father failed to remedy the conditions that led to the children's placement. The court reasoned, "Based on the fact that Father's incarceration had rendered the children without essential parental care and that he has made no attempts to remedy this or even maintain a relationship with A.D.M. and L.B.M., the Court finds that the Agency has easily established grounds for termination for Father pursuant to Section 2511(a)(2),(5) and (8)." Termination Decree, 11/25/14, at 12-13. Hence, Father's failure to exercise reasonable firmness in attempting to overcome the obstacles presented by his incarceration is particularly relevant in this case. As the certified record sustains the trial court's characterization of Father's efforts, we will not disturb it.

During the evidentiary hearing, Nicole Weller, the CYS case worker assigned to the family, testified about the circumstances that led to the boys' placement, including Father's unavailability as a parental resource. N.T., 10/3/14, at 9-10. She also outlined Father's FSP goals and expectations following the children's adjudication of dependency. ***Id***. at 11. As noted, *supra,* Father was directed to, *inter alia*, participate in

psychological evaluations, comply with recommendations, maintain consistent visitation, and comply with the terms of incarceration and probation. *Id*. Father's efforts were minimal. Since the agency does not believe that it can provide any additional services that would assist Father in his ability to care for A.D.M. and L.B.M., it recommended terminating Father's parental rights. *Id*. at 32.

As it relates to Father's efforts to comply with the FSP goals, Ms. Weller testified as follows. Father completed a psychological assessment while incarcerated, but he refused to execute a consent to release confidential information and the prison would not permit CYS to review the evaluation. *Id*. at 20, 49. She explained that the prison assessment was not a complete psychological evaluation and that, to the extent that the assessment generated any treatment recommendations, that information was not provided to the agency. *Id*. at 65. In light of the agency's inability to review the relevant information, the fact that Father submitted to a psychological assessment was of no benefit to the children in determining the effect of Father's mental health on their welfare. Therefore, CYS considered that goal unsatisfied. *Id*. at 20.

Similarly, while Father's incarceration limited his ability to establish financial security or obtain stable housing, he did not provide CYS any information concerning prospective employment or outline his intentions to

satisfy those components upon his release. *Id*. at 22, 65. Father informed CYS of an expected release date, October 26, 2014; however, he failed to present a proposed home plan for the children upon his anticipated discharge. *Id*. at 22, 65. Father claimed to have completed several programs while incarcerated. However, he failed to document any of those achievements and the value of some of the programs is unclear because the FSP did not identify concerns with issues like violence or anger management as problems that Father needed to address in order to reunite with A.D.M. and L.B.M.

Concerning Father's visitation, Ms. Weller testified that Father participated in only one visitation with the children while he was incarcerated. *Id*. at 22. Unfortunately, the family members whom Father selected to facilitate the visitation violated CYS's transportation policies by smoking in the automobile and permitting a person without the Childline clearances to have unsupervised access to L.B.M., and the visitations were thereafter discontinued upon the recommendation of the guardian *ad litem*. *Id*. at 23. Father failed to identify any alternative resources to transport his sons to the prison for additional visitations. *Id*. at 24.

The foregoing testimony supports the trial court's finding that Father failed to remedy his unavailability as a parent or make a significant effort to maintain a place of importance in their lives. Father was either

noncompliant with the FSP goals that he could have achieved in prison or simply neglected to document those achievements. He failed to send his children gifts or attempt to contact them by telephone. In sum, Father participated in one visitation, presumably attended prison programs of unknown value, and mailed his sons a few letters. Tellingly, although given the opportunity to appear virtually the first day and physically the second day of the two-day hearing, Father declined to participate in the termination proceedings. As Father failed to demonstrate any resolve in attempting to overcome the obstacles of his incarceration, we reject his claim that CYS did not satisfy its burden of proving that the conditions which led to the removal of A.D.M. and B.L.M. continue to exist.

Next, we address whether the trial court abused its discretion in finding that CYS presented clear and convincing evidence that terminating Father's parental rights and permanently severing the existing bond between him and his sons would best serve the children's needs and welfare pursuant to § 2511(b). While the Adoption Act does not mandate that the trial court consider the effect of permanently severing parental bonds, our case law requires it where a bond exists to some extent. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993).

The extent of the trial court's bond-effect analysis depends upon the circumstances of a particular case. *In re K.Z.S.*, 946 A.2d 753, 763

- 14 -

(Pa.Super. 2008). We have emphasized that while a parent's emotional bond with his child is a major aspect of the § 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the trial court when determining what is in the best interest of the child. *In re K.K.R.-S.*, 958 A.2d 529, 535-536 (Pa.Super. 2008). Indeed, the mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa.Super. 2008) (trial court's decision to terminate parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child).

As we explained in *In re K.Z.S.*, *supra* at 763 (emphasis omitted),

> In addition to a bond examination, the court may equally emphasize the safety needs of the child under subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs. The trial court should also examine the intangibles such as the love, comfort, security and stability the child might have with the foster parent. Another consideration is the importance of continuity of relationships to the child and whether the parent child bond, if it exists, can be severed without detrimental effects on the child. All of these factors can contribute to the inquiry about the needs and welfare of the child.

*See also In re A.S.*, 11 A.3d 473, 483 (Pa.Super. 2010) (orphans' court can emphasize safety needs, consider intangibles, such as love, comfort, security, and stability child might have with the foster parent, and importance of continuity of existing relationships).

Herein, the trial court concluded that severing the parental bond with Father was in the children's best interest. Our review of the certified record confirms the trial court's conclusion, albeit based on an alternative rationale. A.D.M. and L.B.M. have continued to reside together in a pre-adoptive foster home since April 2014. N.T., 10/3/14, at 29. The foster father is a licensed social worker with a master's degree. *Id*. at 61; N.T., 10/24/14, at 43. Ms. Weller testified that A.D.M. admires Father and sometimes cries for him at night. N.T., 10/3/14, at 74. However, both of the children are bonded with their foster parents, and the agency does not have concerns about the level of care that the foster parents provide. *Id*. at 29, 31. Ms. Weller described the children's bond with the pre-adoptive foster parents as a "loving relationship [that is] continually growing to be more of a parent/child relationship." *Id*. at 30. L.B.M.'s primary bond is unquestionably with the foster mother. She stated that L.B.M. is "very clingy to the foster mother" and explained that during a prior visit to the home, L.B.M. hid from her and a CYS colleague because the child feared that they would remove him from the foster home. *Id*.

Ryan Kane, a permanency worker with Children's Aid Society, testified about his work with A.D.M. N.T., 10/24/14, at 32-33. Mr. Kane expounded that permanency workers meet with children to clarify why they are in placement and prepare them for either reunification or alternate outcomes

depending on the facts of the case. *Id*. at 33. He did not work with L.B.M. because that child was too young to understand the situation with Mother and Father. *Id*. Mr. Kane conducts sessions with A.D.M. twice per month. *Id*. at 37. The sessions can last up to two and one-half hours in duration. *Id*. Beyond the one-on-one discussions with A.D.M., Mr. Kane maintains regular contact with the foster parents and gets updates about A.D.M.'s development and behavior between visits. *Id*.

In relation to A.D.M.'s bond with Father, Mr. Kane testified as follows. The child knows his Father and enjoys his company. A.D.M. was happy to visit Father in jail and mentioned a desire to visit with him more often. *Id*. at 46. However, A.D.M. has also articulated that if he cannot return home to Mother, who remains his primary attachment, "he absolutely wants to be with his foster family[.]" *Id*. at 40. Similar to Ms. Wellers, Mr. Kane testified that A.D.M. and L.B.M. have become very bonded to their foster family. "[O]ver the course of the last several months, [A.D.M.] will tell his foster parents he loves them. So I mean, I think that they are very adapted to the home at this point. [I] [v]ery much think that could be a family for them if need be." *Id*. at 40.

While Mr. Kane did not proffer a position on which home would satisfy A.D.M.'s needs and welfare, he opined that finality in and of itself is in that child's best interest regardless of whether he returns to Mother or remains

- 17 -

with his foster parents. *Id*. at 42. Mr. Kane did not doubt A.D.M.'s ability to thrive emotionally in either situation. *Id*. Moreover, he confirmed that A.D.M. has appropriate services available to him should the trial court decide to terminate either or both parents' parental rights. *Id*. at 41-42.

Mindful of the additional factors that we stressed should be emphasized during the needs-and-welfare analysis in *In re K.Z.S., supra* at 763, such as "the love, comfort, security and stability the child might have with the foster parent" and the importance of continuing those beneficial relationships, we find that the record confirms that terminating Father's parental rights best satisfies A.D.M.'s and L.B.M.'s developmental, physical, and emotional needs and welfare. Despite the appearance of a bond between Father and A.D.M., Father's interactions with his sons were infrequent. CYS intervened with the family due, in part, to Father's unavailability and during the course of A.D.M. and L.B.M.'s placement in foster care, Father's total contact with his children amounted to one visitation and a few letters. As it relates to L.B.M, the evidence demonstrates that he has no bond with Father, as he had little contact with him over his brief life. Accordingly, the record sustains this aspect of the trial court's findings. Terminating Father's parental rights best fulfills L.B.M.'s emotional needs and welfare.

A.D.M's situation is more nuanced. While A.D.M. has not had consistent contact with his Father since before his placement in CYS's care, the facts adduced at trial do not sustain the court's finding that any bond between the seven-year old and Father is minimal. To the contrary, it is obvious from the certified record that A.D.M. admires Father even though there was no significant contact.

Despite A.D.M.'s affection for Father, the certified record reveals that A.D.M. does not look to Father to provide comfort, support, or security. While A.D.M. enjoyed interacting with Father during the prison visitation, there is no evidence of a shared emotional attachment that reveals the hallmarks of a healthy parent-child relationship. Father communicated with A.D.M. sparingly for an entire year, and on the few occasions that Father reached out to his impressionable son, he knowingly misled him to believe that the family would reunite within one or two months. Thus, while some emotional bond exists between Father and A.D.M., it is marked by uncertainty rather than comfort and security. Accordingly, we find that sufficient evidence exists in this case to sustain the trial court's determination. Stated simply, A.D.M.'s primary focus remained reunification with Mother, whose parental rights have been preserved, and he is currently thriving in the foster home. Terminating Father's parental rights best fulfills A.D.M.'s emotional needs and welfare.

Finally, we address Father's contention that it was improper to terminate his parental rights when the court declined to terminate Mother's rights. In sum, Father posits that "it simply does not make sense to terminate the parental rights of one natural parent and not the other." Father's brief at 12. We disagree.

Our Supreme Court addressed this issue in *In re Burns*, 379 A.2d 535 (Pa. 1977), and rejected the assertion that the termination of parental rights of only one parent was improper. The High Court reasoned that the parents' respective rights to their children are not inextricably interwoven and when a child service agency files a petition for the termination of parental rights, the parents' rights are decided separately. Specifically, the *Burns* Court explained:

> Nothing in the Adoption Act requires that an agency, which has assumed custody of a child, must establish grounds for the involuntary termination of both parents, before it can obtain such a decree as to either. When an agency having custody of a child petitions for termination of parental rights, the rights of the respective natural parents must be determined independently.

*Id*. at 541.

Instantly, the trial court declined to terminate Mother's parental rights due to the significant parent-child bond that Mother shares with A.D.M. in particular and also due to Mother's commitment to rectifying the circumstances that led to her sons' placement. *See* Trial Court Decree, 11/25/14, at 18-19. However, unlike the facts relating to Mother, the

evidence that CYS presented against Father during the hearings established the statutory grounds to terminate Father's parental rights by clear and convincing evidence. Thus, consistent with our Supreme Court's rationale in ***Burns***, we reject Father's assertion that the trial court erred in terminating his parental rights to A.D.M. and L.B.M. simply because the court declined to also terminate Mother's parental rights to the children.

For all of the foregoing reasons, we affirm the trial court order terminating Father's parental rights to A.D.M. and L.B.M. pursuant to § 2511(a)(8) and (b) and changing to adoption the pertinent aspects of their permanency goals under the Juvenile Act.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/15/2015

- 21 -