**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | |
|---|---|
| IN THE INTEREST OF: N.B.-A., A MINOR | : No. 11 EAP 2019 |
| | : |
| | : Appeal from the order of Superior |
| | : Court entered on February 19, 2019 at |
| APPEAL OF: E.A., MOTHER | : No. 893 EDA 2018 affirming in part |
| | : and reversing in part the order dated |
| | : March 16, 2018 in the Court of |
| | : Common Pleas of Philadelphia |
| | : County, Family Court Division, at No. |
| | : CP-51-DP-0002607-2016. |
| | : |
| | : ARGUED: September 10, 2019 |

**OPINION**

**JUSTICE TODD**                                    **DECIDED: January 22, 2020**

In this appeal by allowance, we consider whether the evidence was sufficient to establish that E.A. (hereinafter, "Mother") was a perpetrator of child abuse under the Child Protective Services Law ("CPSL"), 23 Pa.C.S. §§ 6301-6386. For the reasons that follow, we hold that it was not, and reverse the decision of the Superior Court.

Shortly after 8:30 a.m. on November 17, 2016, Mother presented to the emergency department of The Children's Hospital of Philadelphia ("CHOP") with her six-year-old daughter, N.B.-A. (hereinafter, "Child"). Mother reported that Child had been experiencing vaginal discharge for three days. According to the emergency department records, Mother advised that she and Child had moved to Philadelphia from the Dominican Republic approximately one year earlier. In response to questions by CHOP staff, Mother further indicated that she had no concerns that Child may have been

sexually abused, and she stated that Child lived with her and Child's maternal grandmother (hereinafter, "Grandmother"). Mother also stated that no males lived in the home. Following a physical examination, which included vaginal swabs, Child was discharged at approximately 11:30 a.m., with instructions to take baths and maintain good hygiene.

Lab testing of the vaginal swabs revealed that Child had chlamydia, a sexually-transmitted infection. Thus, at approximately 2:50 p.m. on November 18, 2016, a nurse practitioner at CHOP telephoned Mother and asked that she return to the hospital with Child for additional testing. Mother and Child returned to CHOP at approximately 4:40 p.m. that afternoon, at which time Child underwent another physical examination and additional testing. According to a Child Protective Services Report ("CPS Report") which CHOP filed with the Department of Human Services ("DHS") later that day, and which was introduced into evidence at a subsequent hearing on March 16, 2018, while at CHOP, both Mother and Child denied any sexual abuse, and Mother again denied that any males lived in the home. The CPS Report also contained a notation that a nurse at CHOP described that "mother's affect was completely unconcerned, and she was wondering where she could order pizza." CPS Report, 11/18/16, at 7.

Additionally, the CPS Report indicated that, although Mother told CHOP staff that no males lived in the home, Child stated that she lived with Mother, Grandmother, and three adult male "uncles." In actuality, the males were Mother's husband (hereinafter, "Stepfather"), and Mother's two stepsons. Child explained that she slept with Mother, while Mother's stepsons slept in one room, and Stepfather slept alone in another room. Child also denied feeling uncomfortable with the males present in the home. When asked if other adults came to their home, Child stated, "[s]ome friends come, they sit on a bench outside, they leave money and they leave." *Id.* at 5. Child further explained, "My mommy

tells them numbers and they give her money." *Id.* When confronted with the discrepancy between her and Child's description of who lived in the home, Mother first stated that the men were Grandmother's uncles, and then stated that the men had moved out of the house one month earlier. Mother and Child remained in the hospital overnight, and Child was discharged at 4:30 p.m. the following day, November 19, 2016. In light of a safety plan that required Child to remain out of her original home, Mother and Child went to stay with Mother's aunt.

On or about November 21, 2016, Sharina Johnson, an investigator with DHS, interviewed Mother.[1] Johnson advised Mother that, as a result of Child testing positive for chlamydia, DHS had opened an investigation. According to Johnson's testimony at a subsequent hearing on March 16, 2018, Mother "appeared very relaxed and not very concerned about . . . the results of the STD testing." N.T. Hearing, 3/16/18, at 15. Johnson also recounted that Mother was having her hair done when she arrived, and, while Johnson was there, that Mother "sat under the dryer to dry her hair with rollers." *Id.* at 22. During this interview, when Johnson asked Mother who lived with her and Child, Mother responded that she, Child, Grandmother, Stepfather, and two of Mother's stepsons lived together. *Id.* at 16. Mother explained, however, that Child slept with Mother in one bedroom; Grandmother slept either on the couch or with Mother and Child; Mother's stepsons shared a separate bedroom; and Stepfather slept in a shed behind the kitchen. *Id.* at 17-18. Mother also stated that none of the men ever slept in the room with her and Child. Mother maintained that she was unaware as to how Child could have contracted chlamydia, and suggested Child may have contracted it at birth, as a friend of

---

[1] Johnson testified at the March 16, 2018 hearing that, during her "initial phone contact texts" with Mother, and during her home interview of Mother, she did not use an interpreter when speaking with Mother, but that Mother requested a Spanish-speaking detective during her visit to the Special Victim's Unit on the night Child was placed in foster care. N.T. Hearing, 3/16/18, at 26.

her mother had a baby who tested positive for a sexually transmitted disease at birth. *Id.* at 18.

Johnson also spoke with Child, utilizing an interpreter. According to Johnson, Child was happy and upbeat, and, when asked "if anyone touched her in a bad way," she replied "no." *Id.* at 25. When asked specifically if she was ever touched in a bad way by Stepfather or his sons, Child once again replied "no." *Id.* at 26. Johnson testified that she requested that all members of the household be tested for chlamydia. *Id.* at 19. Mother was tested on November 21, 2016, and one of her stepsons, F.R.M. (hereinafter, "Stepbrother") was tested on November 23, 2016; both tested positive. Stepfather tested negative. Upon receiving his test results, Stepbrother reportedly fled the hospital and went back to the Dominican Republic. Stepfather eventually went back to the Dominican Republic as well.

On November 22, 2016, DHS obtained an Order for Protective Custody for Child and Child was placed in foster care. On December 5, 2016, Child was adjudicated dependent and it was ordered that she remain in foster care. One month later, Stepbrother was identified as the perpetrator of sexual abuse against Child.[2] The trial court conducted several permanency review hearings between March 2017 and December 2017. On March 15, 2018, Child's guardian *ad litem* ("GAL") filed a motion for a finding of aggravated circumstances against Mother under 42 Pa.C.S. § 6302(2).[3]

---

[2] Although the record does not contain specific details regarding the circumstances of Child's disclosure of abuse, the parties do not dispute that, at some point after Child was placed in foster care, Child disclosed that she had been sexually abused by Stepbrother. *See* DHS Report, printed 3/14/18, at 3 ("The investigation team now has a name for the perp on this report. The alleged perp should be [Stepbrother]."); DHS Brief at 10 ("After the dependency adjudication, Child disclosed she had been sexually abused."); N.T. Hearing, 3/16/18, at 64 (Mother's counsel stating to Mother: "And you're aware that [Child] has since disclosed what happened?").
[3] The Juvenile Act, 42 Pa.C.S. §§ 6301-6375, defines "aggravated circumstances" as, *inter alia*, where "[t]he child or another child of the parent has been the victim of physical

At a hearing on March 16, 2018, DHS first presented the testimony of DHS investigator Johnson, detailed above. DHS also presented the testimony of Dr. Maria McColgan, who treated Child for chlamydia on one occasion after Child was discharged from CHOP.[4] Dr. McColgan explained that, although chlamydia can be contracted through birth, it resolves by the time a child is 2 or 3 years old. As Child was 6 years old at the time of her diagnosis, Dr. McColgan opined that Child was a victim of sexual abuse. Dr. McColgan testified, however, that Child did not have any other physical signs of injury or abuse when she examined her. N.T. Hearing, 3/16/18, at 50. Her testimony in this regard was consistent with Child's medical records from CHOP, which also indicated that Child did not present with any sign of physical injury or abuse, aside from the vaginal discharge initially reported by Mother.

Finally, Mother testified at the hearing. When asked if she could "explain" the testimony of the DHS investigator regarding people who visited her home and gave her money, Mother stated that she worked at her uncle's store, which sold lottery tickets and other items, and "some people would take things and then they would come and pay me later, but I never let them come into the house." *Id.* at 64-65. When asked why she initially did not tell the staff at CHOP that there were males living in the home, Mother replied, "honestly, I didn't know what was going on and I didn't want to involved (sic) anybody, like dad or -- or her brother in something involved with the -- the child." *Id.* at 62. Mother further stated that Child was always cared for by her, Grandmother, or Mother's aunt, and that Child had never told her that she had been sexually abused, which she found to be "very strange because she always tells me everything." *Id.* at 64. With

---

abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent." *Id.* § 6302(2).

[4] Dr. McColgan testified that she saw Child at a "brief visit" for follow-up testing because Child's insurance would not allow her to be seen at CHOP. N.T. Hearing, 3/16/18, at 46, 49.

respect to the suggestion that she seemed "unconcerned" at the hospital when told of Child's diagnosis, Mother explained that "it was just hard for [me] to believe that something could have happened to her because my mom was always with her, and I was always with her." *Id.* at 65. When asked if she currently believed that Child had been sexually abused, Mother stated that, while she never observed the abuse, Child had no need to lie, and Mother did believe and would always believe what Child said. *Id.* at 66-67.

At the conclusion of the hearing, the juvenile court, Judge Lyris F. Younge, stated that she "found Ms. Johnson to be credible," and "found Dr. McColgan to be credible," but "did not find [Mother] to be credible." *Id.* at 85. The juvenile court then entered an order finding that Mother was a perpetrator of child abuse under 23 Pa.C.S. § 6303(b.1), which provides, in relevant part:

> **Child abuse.--**The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
> * * *
>
>   (4) Causing sexual abuse or exploitation of a child through any act or failure to act.
>
> * * *
>
>   (6) Creating a likelihood of sexual abuse or exploitation of a child through any recent act or failure to act.

23 Pa.C.S. § 6303(b.1). The juvenile court further concluded that aggravated circumstances existed pursuant to 42 Pa.C.S. § 6302(2), and that DHS was not required to continue to make reasonable efforts at reunification.

In support of its finding of child abuse under Section 6303(b.1), the juvenile court explained:

> So, if you're confronted with a diagnosis that indicates that your child has been subjected to a sexually transmitted disease, I find it troubling that mom would testify or give information that's not valid or accurate.

So, if there's three males in the household -- during mom's testimony, mom indicated she did not want to involve them. And, at the point that she did that, she put their interests over the well-being of her child.

When asked -- when mother was asked did she believe that [Stepfather] abused her child -- and the follow-up question is, did she believe that [Stepbrother] abused her child.

Mother's response is, "If my child said that," or, "If my daughter said that, then I believe that." I'm concerned about that, because it's like -- it's conditional. "Well, if that's what she says, then I'm going to believe it."

Independently, mom knows that her child tested positive for a sexually transmitted disease. And, even if [Child] never said it, the fact that mother has that medical evidence of some negative traumatic situation that her child experienced at the age of six, mom should be able to say, without a doubt, "I absolutely believe that she was the victim of some type of sexual abuse that resulted in a diagnosis like that.

But mom says, "Well, if she says it, I believe it." And, to me, again, that goes to mom's credibility.

I don't know if mom is, at this point, accepting full responsibility that she, as she self-identified as a primary caregiver, was ultimately responsible for the care and well-being of the child while in her care. So, the fact that this happened while mom was primary caregiver, I believe goes to the fact that, indeed -- that there should be a finding of child abuse.

In terms of lacking the protective capacities, I think that, if mom is not being candid and truthful -- and I would question the protective capacities, as well.

I agree with mother's counsel that mother might have done the best she possibly could, but in this case, that resulted in harm to a child. Given the outcome of the hearing today, I'm absolutely going to make a finding of child abuse.

N.T. Hearing, 3/16/18, at 83-84.

Mother appealed to the Superior Court, which, in a unanimous unpublished memorandum opinion, affirmed in part and reversed in part. *In the Interest of N.B.-A.*, 893 EDA 2018 (Pa. Super. filed Feb. 19, 2019). Specifically, the Superior Court reversed the juvenile court's finding of aggravated circumstances,[5] and its determination that DHS was not required to make further efforts at reunifying Mother and Child. The Superior Court affirmed, however, the juvenile court's finding that Mother was a perpetrator of child abuse under Sections 6303(b.1) and 6381(d)[6] of the CPSL.

In support of its holding, the Superior Court relied on, *inter alia*, Dr. McColgan's testimony that Child's chlamydia did not occur at birth and was the result of sexual abuse; the testimony of the DHS investigator who interviewed Mother and described Mother's demeanor as "relaxed and indifferent to the results of the chlamydia testing," *id.* at 10; and the DHS investigator's testimony that emergency room personnel at CHOP characterized Mother as "relaxed" and "seemingly more concerned about a good place from which to order pizza than her daughter's wellbeing." *Id.*[7] The Superior Court explained:

---

[5] In this regard, the Superior Court noted, *inter alia*, that "DHS admits that it presented no evidence that Mother was an actual perpetrator of physical abuse or sexual violence, a view that the guardian *ad litem* endorses." *In the Interest of N.B.-A.*, 893 EDA 2018, at 16.

[6] As discussed below, Section 6381(d) provides:

> **(d) Prima facie evidence of abuse.--**Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S. § 6381(d).

[7] Mother objected to the introduction of this testimony on the grounds that it constituted hearsay and lacked authentication, but the trial court overruled her objection. On appeal, the Superior Court concluded that any error in the admission of the hearsay statement was harmless, as it was "cumulative" of the DHS investigator's report, wherein the

> Mother testified that either she, [Child's] grandmother, or her great-aunt always cared for [Child]. She denied that [Child] disclosed any abuse to her. However, her testimony suggests that, at a subsequent point in the investigation, [Child] leveled allegations of abuse against both Stepfather[8] and the stepbrother who fled the country. When questioned as to whether she believed her daughter's later allegations, Mother asserted, if "she says that that's what happened, that's what happened." Nevertheless, despite these supportive sentiments, Mother failed to act on her daughter's allegations or attempted [sic] to protect her from abuse. She acknowledged that she did not tell the medical providers that Stepfather or his sons lived in the home. Her rationale for failing to immediately disclose this vital information was "[b]ecause, honestly, I didn't know what was going on and I didn't want to involve . . . anybody, like dad or [Child's] brother in something involved with the -- the child." Even at this juncture, she persists that her failure to disclose the presence of Stepfather and his sons in the home was not an effort to protect them. Mother testified that she is no longer married to Stepfather and that she has no relationship with either him or sons. She further denied that Stepfather ever provided care for [Child].

*Id.* at 11-12 (hearing citations omitted). Based on the foregoing, the Superior Court held that "the juvenile court did not abuse its discretion in concluding that Mother was a perpetrator of child abuse regardless of the fact that her stepson had been identified as the actual perpetrator of the sexual abuse," as "Mother was indifferent to the fact that her daughter contracted a sexually transmitted disease, and she chose to disregard the obvious indicia of abuse." *Id.* at 12-13.

---

investigator had noted the same information, which was offered and admitted into evidence without Mother's objection. *See In the Interest of N.B.-A.*, 893 EDA 2018, at 10 n.7.

[8] The Superior Court cited to pages 66-67 of the hearing transcript to support its statement that Child eventually indicated that Stepfather had abused her. The transcript reveals that counsel for DHS asked Mother, "do you believe that [Stepfather] sexually abused your child?" to which Mother replied, "If she said that, then I say it again, I repeat it: She does not have any need to lie." N.T. Hearing, 3/16/18, at 66. However, we see no other reference in the record to any allegation of sexual abuse of Child by Stepfather; thus, we confine our discussion and analysis to the allegation made by Child against Stepbrother.

The Superior Court further opined:

> In addition to the evidence that established that Mother's inattentiveness to her daughter around the adult stepbrother knowingly or recklessly created a likelihood of sexual abuse, the certified record demonstrates that [Child] suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of Mother. Hence, through the foregoing evidence of record, DHS established a *prima facie* case pursuant to 23 Pa.C.S. § 6381, that Mother was a perpetrator of child abuse, and Mother failed to rebut that presumption of abuse. Accordingly, we do not disturb the juvenile court's finding of child abuse as perpetrated by Mother.

*Id.* at 13-14. In this regard, the Superior Court recognized that the juvenile court "did not specifically invoke § 6381(d)," but concluded that it could affirm the juvenile court's determination on any basis supported by the record. *Id.* at 14 n.8.

Mother filed a petition for allowance of appeal with this Court, which we granted as to the following issues, as framed by Mother:

> (1) Did the Superior Court err by affirming the trial court's finding that Mother was a perpetrator of child abuse in the absence of clear and convincing evidence that she intentionally, knowingly, or recklessly caused or created a likelihood of sexual abuse through a recent act or failure to act?

> (2) Did the Superior Court commit an error of law by applying 23 Pa.C.S. § 6381(d) to find that DHS established a *prima facie* case that Mother was responsible for the abuse perpetrated against [Child] where another individual had been identified as the direct perpetrator?

> (3) Did the Superior Court commit an abuse of discretion by finding that Mother failed to rebut the *prima facie* presumption that she was a perpetrator of child abuse pursuant to 23 Pa.C.S. § 6381(d)?

*In the Interest of N.B.-A.*, 208 A.3d 59 (Pa. 2019) (order).

Preliminarily, we note that the requisite standard of proof for a finding of child abuse pursuant to Section 6303(b.1) of the CPSL is clear and convincing evidence. *In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015) ("a petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations, 42 Pa.C.S. § 6341(c)"). Clear and convincing evidence is "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *G.V. v. Dep't of Pub. Welfare*, 91 A.3d 667, 672 (Pa. 2014). As we discuss *infra*, however, in certain situations, the *identity* of the abuser need only be established through *prima facie* evidence. *In re L.Z.*, 111 A.3d at 1174. As an appellate court, we are required to accept the findings of fact and credibility determinations of the trial court, if they are supported by the record; however, we are not bound by the lower court's inferences or conclusions of law. *Id.*

With these standards in mind, we first address Mother's challenge to the Superior Court's affirmance of the juvenile court's determination that she was a perpetrator of child abuse under Section 6303(b.1) of the CPSL. As noted above, Section 6303(b.1) provides, in relevant part**:**

> **Child abuse.--**The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
> * * *
>
> (4) Causing sexual abuse or exploitation of a child through any act or failure to act.
>
> * * *
>
> (6) Creating a likelihood of sexual abuse or exploitation of a child through any recent act or failure to act.

23 Pa.C.S. § 6303(b.1).

For purposes of the CPSL,

(1) A person acts intentionally with respect to a material element of an offense when:

> (i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and

> (ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

(2) A person acts knowingly with respect to a material element of an offense when:

> (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

> (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

(3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b); *see* 23 Pa.C.S. § 6303 (definitions of "intentionally," "knowingly," and "recklessly" all specify that the term has the same meaning as set forth in 18 Pa.C.S. § 302).

Mother does not dispute that Child was a victim of sexual abuse. However, she contends that DHS failed to offer clear and convincing evidence that she intentionally, knowingly, or recklessly caused or created a likelihood of sexual abuse to Child through

a recent act or failure to act.[9] In this regard, she argues that DHS presented no evidence "that Mother was aware of any risk posed to [Child's] safety by [Stepbrother's] presence in the home, or that Mother consciously and unjustifiably disregarded this risk at her daughter's expense." Appellant's Brief at 20. Quoting the Superior Court, she notes that the only "obvious indicia of abuse," *In the Interest of N.B.-A.*, 893 EDA 2018, at 13, in the record was Child's diagnosis of chlamydia, which does not support a conclusion that she knew or should have known of a danger posed to Child, or that she disregarded any warning signs of potential abuse. Mother further asserts that there was no evidence to suggest that she should have anticipated a need to be particularly "attentive" to her daughter around specific members of her household, Appellant's Brief at 21, and, therefore, there was no basis to conclude that she was reckless in residing with Child in the same house as Stepbrother. Finally, she maintains that DHS improperly relied on her demeanor and affect as evidence to support its allegations.

In support of her position, Mother distinguishes the instant case from those in which, in her view, courts have "properly found that a parent or caregiver's intentional, knowing, or reckless omissions caused or created a likelihood of child abuse." *Id.* at 17 (citing, *inter alia, In re R.P.*, 957 A.2d 1205 (Pa. Super. 2008) (medical evidence that child had more than 100 bruises on his body that were in various stages of healing, as well as evidence of skull fracture and healing wrist fracture, notwithstanding mother's statement that she had not observed any bruises while bathing the child that morning, was sufficient to establish that mother had notice of child's abuse); *In re L.V.*, 127 A.3d 831 (Pa. Super.

---

[9] As discussed, the Superior Court did not find that Mother *intentionally* created a likelihood of sexual abuse to Child, but only that her conduct knowingly or recklessly created a likelihood of sexual abuse to Child. It also bears repeating that the Superior Court observed that "DHS admits that it presented no evidence that Mother was an actual perpetrator of physical abuse or sexual violence, a view that the guardian *ad litem* endorses." *Interest of N.B.-A.*, 893 EDA 2018, at 16.

2015) (finding evidence sufficient to support determination that mother was a perpetrator of child abuse in light of, *inter alia*, the fact that child's rib fractures, even if inflicted by child's father, would have caused child to be in noticeable pain, mother failed to seek appropriate medical care for child, and mother continued to associate with father after father was arrested and charged with abuse); *C.K. v. Dep't of Public Welfare*, 869 A.2d 48 (Pa. Cmwlth. 2005) (mother's conduct in repeatedly taking her three young children to live, for extended periods of time, with individuals she knew were indicated perpetrators of sexual abuse, despite multiple warnings from child welfare agency not to do so, was sufficient evidence that she placed children in imminent risk of sexual abuse under the prior version of 23 Pa.C.S. § 6303(b)(1)(iii) (2013)).

Notably, in its brief, DHS does not challenge or respond to Mother's argument that the Superior Court erred in affirming the juvenile court's determination that Mother was a perpetrator of child abuse under 23 Pa.C.S. § 6303. Rather, as discussed *infra*, DHS argues that the presumption of Section 6381(d) of the CPSL supports the Superior Court's affirmance of the juvenile court's finding that Mother was a perpetrator of child abuse by omission.

Child's GAL, however, argues that there was sufficient evidence to support the juvenile court's finding that Mother was a perpetrator of child abuse under Section 6303(b.1), specifically asserting that Mother's false and/or contradictory statements to CHOP staff regarding who lived in the house constituted "evidence that she had knowledge or was aware of the abuse or risk to Child, but that she consciously disregarded it." Brief of GAL at 34.

Upon careful review, we agree with Mother that the Superior Court erred in affirming the juvenile court's finding that she was a perpetrator of child abuse pursuant to Section 6303(b.1). Unlike the cases of *In re R.P.* and *In re L.V.*, *supra*, in the instant case,

there was no evidence that Child exhibited, prior to her initial visit to CHOP, any injury that would or should have put Mother on notice that Child had been sexually abused. In fact, when Mother first took Child to CHOP on November 17, 2016, Child was discharged with instructions to take baths and maintain good hygiene. DHS presented no evidence that, *prior* to being contacted by a nurse practitioner from CHOP on November 18, 2016, and asked to return to the hospital with Child for additional testing, Mother was aware that Child had a sexually transmitted disease, or that Child had been a victim of sexual abuse. There was no evidence that Child ever told anyone that she had been sexually abused, and, indeed, it is undisputed that, throughout the investigation by DHS, Child consistently denied that she had been sexually abused. Child did not disclose that she had been sexually abused until after she was in foster care. Thus, there is no factual basis for the Superior Court's determination that "Mother failed to act on her daughter's allegations," *In the Interest of N.B.-A.*, 893 EDA 2018, at 12, as there were no allegations on which to act.

Furthermore, DHS presented no evidence that Mother was or should have been aware that Stepbrother posed a risk to Child, or that Mother consciously and unjustifiably disregarded such risk. Once again, Child was not diagnosed with chlamydia until November 18, 2019, and, during the DHS investigation, not only did Child deny that anyone, including Stepbrother, had sexually abused her, Child stated that, if "something bad" did happen to her, she "would tell my mommy because I trust her and I would tell my teacher." CPS Report, 11/18/16, at 5. When interviewed at CHOP, Child also denied "feeling uncomfortable" with the males in the house. *See* Child's CHOP Medical Records (DHS Exhibit 3 to March 16, 2018 Hearing), at 102. Unlike in the case of *C.K.*, *supra*, there also was no evidence to suggest that Stepbrother had previously abused other children, or that Mother would have any reason to suspect that he had.

Finally, once Mother was contacted by CHOP and asked to bring Child back to the hospital for treatment, Mother did so immediately, and there is no evidence that she was not a willing participant in Child's medical treatment.[10]  *Compare In re L.V.*  (evidence established that Mother not only failed to seek medical treatment for her child's fractured ribs, which would have caused considerable pain and which occurred between 10 and 14 days prior to child's hospitalization for subdural brain hemorrhage and abdominal injuries, but also failed to seek follow-up treatment at burn clinic after child was brought to hospital one month earlier with second degree burns to her hand and foot).  Additionally, in contrast to the mother in *In re L.V.*, who continued to associate with the child's father, Mother divorced Stepfather, and she no longer has any contact with her husband or her stepson, the perpetrator of Child's abuse.  Thus, we find that the lower courts erred in concluding Mother was a perpetrator of child abuse under 23 Pa.C.S. § 6303(b.1), as DHS failed to establish, by clear and convincing evidence, that Mother intentionally, knowingly, or recklessly caused or created a likelihood of sexual abuse to Child through a recent act or failure to act.

Although Child's GAL contends that Mother's "fabrication of false and contradictory statements" is evidence that she knew of the abuse, or was aware of the risk of abuse, Brief of GAL at 34, we cannot agree.  The Superior Court addressed a similar issue in *In the Interest of J.M.*, 166 A.3d 408 (Pa. Super. 2017).  In that case, the child's maternal grandmother took him to the hospital, where he was diagnosed with a fractured wrist.  According to the doctors, the injury was the type that could have been caused accidentally, for example, by the child falling on his outstretched arm.  However, the

---

[10] Indeed, in addition to the hospital records from Child's November 17, 2016 visit to CHOP, the original record also contains CHOP's records from Child's visit to the emergency room one week earlier, on November 10, 2016, at which time Mother reported that Child had been complaining of a headache.  Child was diagnosed with a virus and discharged that same day with instructions to take Motrin.

child's mother indicated that she did not know what had caused the injury, and she volunteered that there was a history of physical violence involving the family of the child's father. In a subsequent dependency proceeding, the child's mother alternately testified that the injury occurred while the child was with his maternal grandmother, and then that the injury occurred when the child was with his paternal grandmother. The juvenile court opined that, "Mother's unbelievable testimony further indicates that she's attempting to conceal what happened to the [C]hild while in her care, and she is responsible for the injuries to the child while in her care." *Id.* at 414. It thus determined, *inter alia*, that the mother was a perpetrator of child abuse pursuant to Sections 6303(b.1) and 6381(d) of the CPSL. On appeal, the mother of J.M. argued, *inter alia*, that DHS failed to prove by clear and convincing evidence that the child's injury was the result of child abuse rather than accidental injury. The child advocate, however, argued that the abuse was proven through the "conflicting histories" the mother provided regarding the custody of the child over the period of time the fracture occurred. Specifically, the child advocate asserted that the mother "misled both the hospital and DHS and blamed the paternal relatives for the Child's history." *Id.* at 425 (quoting record).

In reversing the decision of the trial court, the Superior Court first observed:

> In light of the inconsistencies in the record, as well as its observations of Mother's demeanor, the family court concluded that Mother's testimony was not believable, that Mother "tried as best as she could to confuse," and Mother was "attempting to conceal what happened to the child while in her care and she is responsible for the injuries to the child while in her care."

*Id.* The court, however, noted that "suspicions are not a substitute for clear and convincing evidence. Although the trial court was free to rely on its findings about Mother's testimony, it could not, as a matter of law, find that the Child was abused solely on that basis." *Id.* at 427. In the instant case, although we are troubled by Mother's initial

false statements to CHOP regarding the male residents of her household, those statements in and of themselves are insufficient to establish, under a clear and convincing evidence standard, that, prior to the time she made those statements, Mother knew or should have known of a danger posed to Child by Stepbrother, or that Mother disregarded warning signs of potential abuse. To conclude otherwise would be mere conjecture.

Finally, in the case *sub judice*, there has been great focus by DHS and Child's GAL on Mother's "relaxed" demeanor while she was with Child at CHOP on November 18, 2016, and the fact that she asked a nurse about a good place to order a pizza, rather than, as counsel for DHS stated in her closing argument, how she could "find the person who did this to my child." N.T. Hearing, 3/16/18, at 73. Although DHS and Child's GAL interpret Mother's demeanor upon learning that Child tested positive for chlamydia as indifference to the fact that Child was sexually abused, such inferences by the parties are not binding on this Court, and we find there are other reasonable interpretations of Mother's behavior. Notably, in light of the fact that Mother and Child arrived at CHOP at 4:40 p.m. on the afternoon of November 18, 2016, and were not discharged until nearly 24 hours later, Mother's inquiry as to where she could obtain food could just as reasonably be viewed as an effort to keep Child happy and comfortable, and her "relaxed" demeanor an attempt not to alarm Child.

More critically, however, and regardless of how one views Mother's behavior and/or demeanor *after* she was told of Child's diagnosis of chlamydia, we find that behavior and demeanor are insufficient to prove, by clear and convincing evidence, that Mother knew or should have known of a risk posed to Child by Stepbrother, or that she consciously and unjustifiably disregarded any such risk. Accordingly, for all of the foregoing reasons, we hold there was insufficient evidence to support the juvenile court's finding that Mother was a perpetrator of child abuse under 23 Pa.C.S. § 6303(b.1).

We now turn to Mother's argument that the Superior Court erred in *sua sponte* applying the presumption in Section 6381(d) of the CPSL to hold that DHS established a *prima facie* case that Mother was a perpetrator of child abuse by omission. Section 6381, titled "Evidence in court proceedings," provides, in pertinent part:

> **(d) Prima facie evidence of abuse.--**Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S. § 6381(d).

Mother first asserts that the juvenile court's *sua sponte* application of Section 6381(d) represents an unprecedented expansion of the presumption that was not intended by the legislature, and does not serve the underlying purpose of the statute. She further argues that, even if Section 6381(d) could be applied in situations like the instant case, where the actual perpetrator of the abuse has been identified, the presumption cannot serve as a basis for affirming the trial court's decision in this case because it was not raised, litigated, or relied on by the trial court, and, therefore, has been waived. *See J.W. v. Dep't of Pub. Welfare*, 9 A.3d 270 (Pa. Cmwlth. 2010). Finally, Mother maintains that the evidence does not support the application of the Section 6381(d) presumption because there was no evidence to suggest that Mother knew or should have known of any danger that existed to Child as result of the other individuals living in the household.[11]

---

[11] The American Civil Liberties Union of Pennsylvania (ACLU) filed an *amicus* brief in support of Mother, echoing her argument that the Superior Court misapplied Section 6381(d). First, the ACLU reiterates that the Section 6381(d) presumption was intended to allow a parent to be held responsible in cases where there is an absence of direct evidence as to the actual perpetrator of the abuse, and that, in the instant case, the presumption does not apply because Stepbrother was identified as the actual perpetrator

In response to Mother's claim that the Superior Court erred in applying the presumption to the instant case, DHS first argues that the Superior Court properly applied the Section 6381(d) presumption because *In re L.Z.*, *supra*, "compels the conclusion that in situations exactly like this one − where abuse has occurred and the perpetrator is not apparent − the presumption applies to hold the parent responsible." Brief of DHS at 21.[12]

As to Mother's argument that Section 6381(d) was not intended to apply in situations where the actual perpetrator of the abuse has been identified, DHS contends: (1) although DHS indicated Stepbrother as a perpetrator, there was never a *judicial* determination identifying him as such; and (2) Mother fails to cite any case law that holds the presumption applies *only* to cases in which the actual perpetrator has not been identified. *Id.* at 29.

Finally, DHS notes that, because the Section 6381(d) presumption is rebuttable, there is no basis for a concern that application of the presumption in situations where the identity of the perpetrator of the abuse is known will result in parents being held "strictly liable" for abuse of their children committed by others, even outside of the home. *Id.* at 31. Child's GAL similarly contends that Section 6381(d) of the CPSL does not exempt parents from responsibility where there is another identified perpetrator.[13] It further

of the sexual abuse of Child. ACLU further emphasizes that Section 6381(d) is not applicable because no evidence was presented to suggest that the abuse occurred as a result of Mother's acts or omissions, or that the harm to Child in this case was foreseeable. Finally, the ACLU suggests that, in the absence of any evidence that Mother knew or should have known of a risk of sexual abuse to Child, forcing Mother to rebut the Section 6381(d) presumption converts a rebuttable presumption into an irrebuttable one, which violates due process.

[12] DHS's premise in this regard is plainly erroneous, as Stepbrother was identified as the perpetrator of the sexual abuse.

[13] Although Child's GAL does not currently dispute that there was an identified perpetrator of the sexual abuse of Child in this case, we note that, at the March 16, 2018 hearing, Child's GAL stated, in her closing argument, "this is not a case where we can clearly identify any particular person as the perpetrator today." N.T. Hearing, 3/16/18, at 76. This statement clearly was erroneous, as Stepbrother had already been identified as the

maintains that the presumption is particularly applicable in the instant case in light of Mother's "lying and obfuscation." Brief of GAL at 49.

Upon review, we conclude that the Superior Court did, in fact, err in applying the Section 6381(d) presumption to the instant case. We base our decision on a reading of the plain language of Section 6381(d), which, as noted above, provides that evidence that a child has suffered child abuse *of such a nature as would ordinarily not be sustained or exist except by reason of the acts of omissions of the parent or other person responsible for the welfare of the child* shall constitute *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

As discussed above, there was no evidence presented in this case that Mother perpetrated the abuse. Moreover, there was no evidence presented that Mother knew or should have known that Child was being abused, sexually or otherwise, as Dr. McColgan testified that Child did not present any physical signs of injury or abuse when she initially examined her, and such testimony was consistent with the medical records from CHOP, which indicated that Child did not have any signs of physical injury or abuse, aside from the vaginal discharge reported by Mother. At that time, Child was discharged with instructions to take baths and maintain good hygiene.

Further, DHS presented no evidence that, prior to being asked by a nurse practitioner from CHOP on November 18, 2016 to bring Child to the hospital for additional testing, Mother was aware that Child had a sexually transmitted disease, or that Child had been a victim of sexual abuse. There was no evidence that Child ever reported that she had been sexually abused, and, even throughout the investigation by DHS, Child continually denied that she had been sexually abused. Additionally, DHS offered no

individual who sexually abused Child. It is concerning to this Court that, in making their arguments to the trial court and to this Court, both DHS and Child's GAL have stated − incorrectly − that the identity of the actual perpetrator of the sexual abuse against Child is unknown. *See supra* note 12.

evidence that Mother knew or should have known that Stepbrother posed a risk to Child, but ignored that risk. In short, we cannot find that the abuse in this case was of a type that would ordinarily not occur except for the acts or omissions of the child's caretaker.

Although the tragic crime of sexual abuse of a child may occur when a child is without proper parental supervision or care, it may also occur *despite* a parent's best efforts to care for and supervise a child. Sadly, children are vulnerable to abuse when they are at day-care or in school; when they are involved in church, athletic, or other activities; and even when they are under the supervision of trusted friends or family. Yet, parents cannot be with their children every minute of every day, and the vast majority of children engage in the aforementioned activities without incident. Applying the Section 6381(d) presumption to cases such as the one before us, where DHS presented no evidence that Mother was or should have been aware that Stepbrother posed a risk to Child, or that he or anyone else was abusing Child, would essentially allow a parent to be deemed a perpetrator of child abuse by omission in every case where a child is abused, placing the burden on the parent to prove that they had no reason to believe that their child was at risk. Accordingly, we hold that the Section 6381(d) presumption is not applicable where there is no evidence that the parent or other person responsible for the welfare of the child knew or should have known of the abuse or the risk of abuse and disregarded it. As DHS failed to offer any evidence that Child's abuse was of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child, the Superior Court erred in applying the Section 6381(d) presumption.

In light of our determination, we need not address the parties' arguments with regard to whether the fact that the perpetrator of the abuse was identified precludes application of the Section 6381(d) presumption. Further, as we conclude that Section

6381(d) is not applicable in the instant case, we need not reach the issues of whether DHS waived application of the presumption, and whether the Superior Court abused its discretion in concluding that Mother failed to rebut the *prima facie* presumption that she was a perpetrator of child abuse pursuant to Section 6381(d) of the CPSL.

For the reasons set forth above, we hold that the Superior Court erred in affirming the juvenile court's determination that Mother was a perpetrator of child abuse, and we reverse that portion of Superior Court's decision.

Chief Justice Saylor and Justices Donohue and Wecht join the opinion.

Justice Dougherty files a concurring opinion in which Justice Baer joins.

Justice Wecht files a concurring opinion in which Justices Baer and Dougherty join.

Justice Mundy files a concurring and dissenting opinion.